# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOEL C. THIBODEAUX,** | **CIVIL ACTION** |
| **Plaintiff** | |
| **VERSUS** | **NO. 12-1375** |
| **WELLMATE, ET AL.** | **SECTION: "E" (5)** |
| **Defendants** | |

## ORDER AND REASONS

Before the Court is Defendant's motion *in limine* to strike the expert testimony of Cynthia Smith.[1]

## BACKGROUND

Plaintiff Joel C. Thibodeaux ("Thibodeaux") brings claims against Defendant Pentair Water Treatment OH Company ("Pentair") under the Louisiana Products Liability Act ("LPLA").[2] Thibodeaux was injured after the bladder in a water pressure tank, manufactured by Pentair, ruptured on a platform operated by Chevron USA Inc., Thibodeaux's employer and the plaintiff-in-intervention.[3] Thibodeaux alleges, among other theories, that the tank "contained a manufacturing or design defect," "is unreasonably dangerous in construction or composition," "is unreasonably dangerous in design," and "is unreasonably dangerous because an adequate warning about the product has not been provided."[4]

On February 5, 2016, Pentair filed a motion *in limine* to strike the proposed expert testimony of Cynthia Smith.[5] Pentair also sought to strike the proposed testimony of

---

[1] R. Doc. 94.
[2] LA. REV. STAT. §§ 9:2800.51–.60.
[3] R. Doc. 93-20 at 5; R. Doc. 101 at 10; R. Doc. 102-1 at 8.
[4] R. Doc. 77 at 2.
[5] R. Doc. 94.

Bryan Durig,[6] but counsel for Thibodeaux subsequently informed the Court that Thibodeaux has withdrawn Durig as an expert witness and that Durig will not be called to testify at trial.[7] Therefore, the Court **DENIES AS MOOT** Pentair's motion *in limine* as it pertains to the testimony of Bryan Durig.

Thibodeaux proffers Smith as a materials science expert to testify about the alleged design, manufacturing, and warning defects of the tank at issue.[8] Thibodeaux filed an opposition to Pentair's motion *in limine* on February 23, 2016.[9]

## STANDARD OF LAW

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[10]

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[11] provides the analytical framework for determining whether expert testimony is admissible under Rule 702.

Under *Daubert*, courts, as "gatekeepers," are tasked with making a preliminary assessment of whether expert testimony is both relevant and reliable.[12] The party offering

---

[6] *Id.*
[7] *See* R. Doc. 118 at 4; R. Doc. 150 at 8–9.
[8] R. Doc. 114-2 at 5.
[9] R. Doc. 100.
[10] FED. R. EVID. 702.
[11] 509 U.S. 579 (1993).
[12] *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (citing *Daubert*, 509 U.S. at 592–93).

2

the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[13]

The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid."[14] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.[15] "These factors are (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[16]

The Supreme Court has cautioned that the reliability analysis must remain flexible: the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[17] Thus, "not every *Daubert* factor will be applicable in every situation . . . and a court has discretion to consider other factors it deems relevant."[18] The district court is offered broad latitude in making expert testimony determinations.[19]

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact.[20] "Unless wholly unreliable, the data on which the expert relies goes to the

---

[13] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[14] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).
[15] *Daubert*, 509 U.S. at 592–96.
[16] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).
[17] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).
[18] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004).
[19] *See, e.g., Kumho Tire*, 526 U.S. at 151–53.
[20] *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).

weight and not the admissibility of the expert opinion."[21] Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[22] The Court is not concerned with whether the opinion is correct but whether the preponderance of the evidence establishes that the opinion is reliable.[23] "It is the role of the adversarial system, not the court, to highlight weak evidence."[24]

## ANALYSIS

In Smith's report, Smith concludes that the Wellmate 12 water pressure tank at issue was "unreasonably dangerous in construction and composition," "unreasonably dangerous in design," and "unreasonably dangerous because the manufacturer failed to provide adequate and sufficiently permanent warning[s] about latent dangers associated with this system."[25] Her report states that her investigation included "the analysis of an injection molded PVC drain pipe, a fractured elastomer air cell that was blow molded during manufacturing, a fiber-reinforced composite tank, polymer warning labels, and label adhesives that may have been subjected to weathering conditions during service."[26]

Pentair's motion calls into question Smith's qualifications to render an opinion in this matter.[27] In addition, Pentair argues that Smith's testimony is speculative, lacks foundation, and is unreliable.[28]

---

[21] *Rosiere v. Wood Towing, LLC*, No. 07-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)) (emphasis added); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *6 (E.D. Pa. May 4, 2011).
[22] *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).
[23] *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).
[24] *Primrose*, 382 F.3d at 562.
[25] R. Doc. 102-13 at 15.
[26] *Id.* at 5.
[27] *See, e.g.*, R. Doc. 94-1 at 9.
[28] *Id.* at 16–19.

Smith has a bachelor's degree in materials science and engineering.[29] Her *curriculum vitae* reflects that she has a wide array of experience regarding materials science and investigative chemistry. For example, for more than five years, Smith served as the manager of material analysis with Uponor North America, "an engineering services laboratory dedicated to failure analysis of metals and extruded/injection molded polymers, investigative chemistry, process research and development, and materials engineering related to warranty claims resolution and new product development."[30] For six years, she worked as a metallurgical failure analyst with AlliedSignal Engines, where she "[c]onducted sophisticated failure analysis of numerous gas turbine engine components," according to her *curriculum vitae*.[31] Smith also has experience managing a failure analysis and investigative chemistry group, where she conducted "hands-on failure analysis" for projects involving materials such as metals, plastics, and composite systems.[32] Since 2009, Smith has been the principal, president, and technical manager of Paragon Polymer Consulting, LLC, which provides forensic consulting for metals, polymers, and composites; failure analysis; investigative chemistry; and materials testing and analysis.[33] Her "[a]nalyses include determination of the root cause of failure, evaluation of material integrity, and investigation to determine if a manufacturing defect, environmental degradation, atypical residual and/or applied stresses, or improper installation may have contributed to failure."[34]

---

[29] R. Doc. 102-16 at 2.
[30] *Id.*
[31] *Id.* at 3.
[32] *Id.*
[33] *Id.* at 2.
[34] *Id.*

The opinions contained in Smith's report regarding the construction, composition, and design of the Wellmate 12 tank are based on Smith's "detailed visual examination" and "detailed inspection" of the materials in the tank and bladder at issue.[35] According to Smith's report, both she and Pentair's engineering expert Tom Proft "jointly performed the following analyses to evaluate the condition of the incident components: Stereomicroscopy[;] Scanning Electron Microscopy with Energy Dispersive X-ray Spectroscopy[;] Tensile Testing . . . [;] Tear Testing . . . [;] Fourier Transform Infrared Spectrometry[;] Differential Scanning Calorimetry[;] Melt Flow Testing . . . [; and] Shore A Durometer Hardness Testing."[36] Much of Smith's report details her findings as a result of each of the analyses.[37]

The Court finds that, given Smith's extensive experience, she is qualified to testify about the material composition, construction, and design of the tank, the bladder, and the drain assembly.[38] The Court further finds that Smith has relied on sufficient facts and that her opinions regarding the material composition, construction, and design of the tank are the product of reliable principles and methods—namely, the analyses she performed jointly with Pentair's engineering expert. Smith's report and proposed testimony are directly relevant to the issues in this case, as she provides information about the composition and construction of the tank and bladder as well as opinions regarding whether the tank at issue had a design or manufacturing defect.[39]

---

[35] *See, e.g.,* R. Doc. 102-13 at 10–11.
[36] *Id.* at 11–12.
[37] *See id.* at 12–15.
[38] *See* Fed. R. Evid. 702 (governing "[a] witness who is qualified as an expert by knowledge, skill, experience, training, *or* education"); an expert might draw a conclusion from a set of observations based on extensive and specialized experience.

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156, 119 S. Ct. 1167, 1178, 143 L. Ed. 2d 238 (1999)
[39] Pentair does not argue Smith's opinions are irrelevant to the issues in this case. *See* R. Doc. 94-1.

Smith, however, may not provide testimony regarding the adequacy of the warning labels, regarding whether warning labels were present on the Wellmate tank at the time the tank left Pentair's control, regarding the adhesion and permanency of the warnings on the tank, or regarding whether Pentair's procedure for affixing the primary brand label was more rigorous than its procedure for affixing the warning labels to the tank. In Smith's report, she opines, "I[t] appears that very little priority was given to the need for permanency with regard to warning labels."[40] She notes that a label exhibiting the Wellmate brand name remained on the tank's exterior while the warning labels Pentair attached to the tank at the time of manufacture no longer remained on the tank's exterior or drain pipe.[41] From this, she concludes that "Pentair possessed the knowledge and ability to provide a greater level of permanency for their warning labels at the time of manufacture than appears to have been demonstrated by the warning labels that were allegedly applied to the incident tank . . . ."[42] Further, Smith remarks skeptically in her report that the tank ever had warning labels affixed to it as Pentair contends. For example, she states in her report, "Pentair possessed the knowledge and ability to provide a greater level of permanency for their warning labels at the time of manufacture than appears to have been demonstrated by the warning labels that were allegedly applied to the incident tank *(if those labels were actually applied at all)*."[43] In her deposition, Smith testified, "[A]t this point I have not found convincing evidence that there necessarily ever was a label on the drain pipe."[44]

---

[40] R. Doc. 102-13 at 10.
[41] *Id.* at 9–10.
[42] *Id.*
[43] R. Doc. 102-13 at 9–10 (emphasis added).
[44] R. Doc. 93-14 at 33.

Smith's conclusions with respect to the existence and permanency of the warnings appear to be almost entirely drawn from the fact that the warnings were not present at the time she inspected the tank, several years after the tank left Pentair's control.[45] She did not know what kind of adhesive Pentair used to attach the labels to the tank, and she did not test the adhesive on any warnings associated with Wellmate tanks.[46] Because her testimony with regard to the adhesion and permanency of the warnings on the Wellmate tank is not based on sufficient facts or data and is not the product of reliable principles and methods, the Court will not allow Smith to provide testimony on the adequacy, existence, or permanency of the warnings.[47]

Moreover, Smith may not provide testimony regarding the likelihood that other similar accidents occurred.[48] Smith did not address this issue in her report. It does not appear that Smith will be asked to testify about the likelihood that other similar accidents occurred, but, to the extent she is, it will not be allowed.

## CONCLUSION

**IT IS ORDERED** that Pentair's motion *in limine* to strike the expert testimony of Cynthia Smith is **GRANTED IN PART AND DENIED IN PART** as set forth above.[49]

---

[45] *See id.*; R. Doc. 102-13 at 9–10.

[46] R. Doc. 102-13 at 9–10.

[47] *See* FED. R. EVID. 702.

[48] Smith testified in her deposition that Pentair has "reported with tremendous specificity that [it has] not had any other reports of failures occurring in this exact manner, with this exact air cell, with this exact tank. The sheer specificity of [its] answer, in my opinion, implies that [it] indeed [has] likely had other failures and [it is] using semantics to bury those failures." R. Doc. 93-14 at 34–35.

[49] R. Doc. 94. Pentair also filed a motion *in limine* to preclude Thibodeaux's experts from providing speculative testimony. R. Doc. 125. That motion was filed beyond the deadline to file motions *in limine* regarding the admissibility of expert testimony and was therefore untimely. *See* R. Doc. 74 at 6. Accordingly, that motion will not be considered and is **DENIED**. Nevertheless, many of the issues raised in that motion have been addressed herein.

8

New Orleans, Louisiana, this 24th day of May, 2016.

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**